STATE of Missouri, Plaintiff–
Respondent,

v.

Brittany Devonce PURL, Defendant–
Appellant.

No. 28197.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 31, 2007.

Ellen H. Flottman, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora A. Fichter, Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Judge.

Brittany Devonce Purl ("Appellant") brings this appeal from a conviction in a

jury tried case of possession of a controlled substance with intent to deliver in violation of section 195.211.[1] Appellant claims (1) the trial court abused its discretion in overruling defense counsel's objection to the State's closing argument and (2) that the trial court plainly erred in instructing the jury in the disjunctive because there was not evidence to support both alternatives. We find no error and affirm.

Appellant does not challenge the sufficiency of the evidence. We view the evidence in a light most favorable to the verdict. *State v. Johnson*, 95 S.W.3d 221, 222 (Mo.App. S.D.2003). Following this standard of review, the record shows that on March 7, 2006, Daniel Seger, with the City of Cape Girardeau Police Department, was contacted by a confidential informant named Dianne. Officer Seger and Officer William Bohnert made a plan for Dianne to contact Appellant to purchase drugs from him. Dianne called Appellant on a cellular phone and put him on the speaker so the officers could hear the conversation. Both officers were familiar with Appellant's voice and recognized it. Dianne ordered a controlled substance; Appellant said he would deliver it to the Victorian Inn. After the telephone call, the officers and Dianne went to a room at the Victorian Inn and waited. When Appellant did not come, Dianne contacted him several more times over the course of several hours and each time Appellant said that he would be on the way. Dianne contacted Appellant again, Appellant said that he would not be there, and Dianne needed to contact Avery Winks ("Winks"). Dianne contacted Winks and ordered drugs from him; however, when Winks did not arrive at the Victorian Inn either, Dianne called Appellant one more time. During this conversation, Appellant said

"I'm right around the corner. We will be there."

Meanwhile, as the officers and Dianne were waiting at the Victorian Inn, Appellant had contacted Winks and asked him to "meet him at Pop's house on South Sprigg Street." Melissa Davis ("Davis"), who was with Winks and Appellant, witnessed Appellant receive a phone call where he told Dianne to call Winks. Winks then received the phone call from Dianne and they discussed that Dianne would buy 1/4 ounce of crack cocaine. Winks did not have this amount and needed to go to his drug dealer. Winks, Davis and Appellant all got in Winks' car to go to the Super 8 motel where Winks could buy drugs; however, Winks' drug dealer did not like dealing with people he did not know, therefore, Winks dropped Appellant and Davis off at the 101 Rhodes gas station to wait. After Winks purchased the drugs, he picked Appellant and Davis up at the gas station and the three went directly to the Victorian Inn where they were arrested. Winks and Davis had crack cocaine in their possession. A total of 3.82 grams of crack cocaine was seized from either Winks or Davis but not Appellant.

After the arrests took place, Winks gave a statement to the police. He told police officers that at about 5:30 p.m., Appellant called Winks and said to "meet him at Pop's house on South Sprigg Street." Winks met Appellant at Pop's house with Davis where Appellant was "counting his money." Appellant asked Winks if he would go to his drug dealer and get 1/4 ounce of crack cocaine. Winks asked Appellant to go in on the deal with him, so they would each buy a 1/8 ounce and split the profit and Appellant agreed. On the way to the Super 8 motel to meet the drug dealer, Winks dropped Appellant and Davis off at a gas station because the drug

---

1. All references to statutes are to RSMo 2000, unless otherwise specified.

dealer did not want Winks to bring anyone else. Winks picked up Appellant and Davis and together they went to the Victorian Inn.

Winks testified at trial as a witness for the State, but denied Appellant's involvement in the sale. He remembered giving a statement to the police at the time of his arrest, but denied the portions of it that implicated Appellant in the sale, saying that Appellant only asked him to go to the hotel with him and do something "other than the drugs." Davis, as a witness for the defense, testified that Winks asked Appellant if he wanted to participate in the drug deal but Appellant declined. According to Davis, Winks alone purchased the drugs for Dianne and then she and Appellant accompanied Winks to the Victorian Inn.

The jury instruction given was based on MAI—CR 3d 304.04 and 325.08, on accessory liability. The instruction named Winks as the person who (1) possessed the controlled substance, (2) knew or was aware of its presence, and (3) intended to deliver the crack cocaine to another person. The instruction set forth Appellant's guilt, "with the purpose of promoting or furthering the commission of that possession of crack cocaine with intent to deliver, he acted together with or aided Avery Winks in committing that offense." The jury found Appellant guilty of possessing a controlled substance with intent to distribute. The court sentenced Appellant, as a prior and persistent offender, to twelve years in the Missouri Department of Corrections.

■ In his first point, Appellant argues that the trial court abused its discretion in overruling defense counsel's objection during the State's closing argument when the prosecutor told the jury that it took Appellant so long to deliver the cocaine because he was having "a tough time coming up

with the crack cocaine on his own," thereby inferring that Appellant was a drug dealer and would have delivered the crack cocaine himself if it had been available to him. Appellant contends the statements were unsupported by the evidence and designed merely to inflame the passions and prejudices of the jury. He further argues that the prosecutor's statements concerning why it took so long for Appellant to locate the crack cocaine caused the jurors to assume that the prosecutor had outside knowledge regarding the events of that day and Appellant's actions. We disagree.

■ It is permissible for the prosecutor to comment on the evidence and the credibility of witnesses from the State's viewpoint. *State v. Link*, 965 S.W.2d 906, 912 (Mo.App. S.D.1998). It is, however, improper for the prosecutor to argue facts outside the record. *State v. Martin*, 103 S.W.3d 255, 264 (Mo.App. W.D.2003). "The trial court has broad discretion in controlling the scope of closing argument, and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant." *State v. Ferguson*, 20 S.W.3d 485, 498 (Mo. banc 2000). To ascertain the impropriety of an argument, the appellate court examines the context in which the argument was made and we consider the argument as a whole to determine the tenor of the challenged language. *Lung v. State*, 179 S.W.3d 337, 342 (Mo.App. S.D. 2005). "The golden thread running through all the cases on this subject is an inquiry into whether the prosecutor's statement of his belief appears to be based on the evidence which has been introduced before the jury." *State v. Anthony*, 577 S.W.2d 161, 163 (Mo.App. W.D.1979).

During closing argument, the prosecutor argued as follows:

[PROSECUTOR]: Now, the defense will argue that [Appellant], he didn't show up right away. Several hours elapsed. That is true. But why did all of this time elapse? Why did it take so long? There is a very good reason. What is really going on here is that [Appellant] was having a tough time coming up with the crack cocaine on his own.

[DEFENSE COUNSEL]: Objection, Judge. Arguing facts not in evidence.

THE COURT: This is closing argument. I will overrule the objection.

[PROSECUTOR]: When you apply your reason and common sense here, we know why [Appellant] didn't come right here with the crack cocaine. And we found that out when Avery Winks took the stand and you found out about the statement that he gave to the police.

He told the police right after he was arrested [Appellant] and the supplier weren't getting along. So much so that [Appellant] couldn't even go with Avery Winks when he drove to pick up the crack cocaine. He had to drop [Appellant] off at the Rhodes 101 gas station.

Even Melissa Davis made a comment about that. The supplier, he doesn't know many people, and, you know, he doesn't want to sell to people he is not familiar with. So, [Appellant] needed Avery Winks to come up with that quantity of crack cocaine. And that makes sense in light of Avery Winks's statement that he gave to the police.

As mentioned above, a prosecutor is allowed to argue all reasonable inferences from the facts on the record without going outside the record. It is clear from all the evidence that it did in fact take Appellant a long time to arrive with the crack cocaine and that he was not the one who provided it. Dianne had to contact Appellant several times over the course of several hours and each time Appellant said that he would be on the way until finally Appellant said that he would not be there, and Dianne needed to contact Winks. The evidence was consistent that Winks went to the drug dealer's location alone and that the dealer did not like to do business with people he did not know. That is not an inference; it is a statement from Winks to the police and at trial. The prosecutor specifically said, "[w]hen you apply your reason and common sense ... we found that out." It is a reasonable inference Appellant was having a tough time getting the crack cocaine because he was not friendly with the dealer and had to send his "customer" to another source to obtain the drugs. The trial court did not abuse its discretion in overruling the objection to the prosecutor's comments as the statements were not an unfair comment on the evidence. Point one is denied.

■■■ In his second point, Appellant claims that the trial court plainly erred in submitting Jury Instruction No. 5, which he claims inappropriately submitted, in the disjunctive, alternative theories of guilt, one of which was not supported by the evidence. Appellant claims *State v. Puig*, 37 S.W.3d 373, 377 (Mo.App. S.D.2001), provides that the use of the disjunctive, in this case, was not appropriate. In *Puig*, this Court held that the use of the disjunctive was not appropriate where there was no evidence that the defendant "acted with" the accomplice. *Id.* at 377–78. Appellant acknowledges that this point was unpreserved at trial and, therefore, requests plain error review. Plain error review under Rule 30.20,[2] is discretionary and granted where a claim of plain error facially establishes substantial grounds for

**2.** All rule references are to Missouri Court Rules (2007), unless otherwise specified.

believing that manifest injustice or miscarriage of justice has resulted. *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). The trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice for instructional error to rise to the level of plain error. *State v. Parkus,* 753 S.W.2d 881, 888 (Mo. banc 1988).

Instruction No. 5 provided, in pertinent part, as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.
>
> . . . .
>
> First ... Avery Winks possessed crack cocaine, a controlled substance, and
>
> Second, that Avery Winks knew or was aware of its presence and nature, and
>
> Third, that Avery Winks intended to deliver the crack cocaine to another person, then ... the offense of possession of crack cocaine with intent to deliver has occurred ....
>
> Fourth, that with the purpose of promoting or furthering the commission of that possession of crack cocaine with intent to deliver, the defendant *acted together with or aided* Avery Winks in committing the offense, then you will find the defendant guilty of possession of crack cocaine with intent to deliver.

MAI–CR3d 304.04 and 325.08

Submitted by the State

(Emphasis added.)

Appellant contends that Instruction No. 5, as laid out above, was submitted to the jury in error because it submitted in the disjunctive the alternative theories of "acting together with" or "aiding" Winks and there is insufficient evidence to support the alternative theory that Appellant "acted together with" Winks. A person is criminally responsible for the conduct of another when "he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). "The central tenet of accomplice liability is the notion that all who act together 'with a common intent and purpose' in committing a crime are equally guilty." *State v. Biggs,* 170 S.W.3d 498, 504 (Mo.App. W.D.2005) (quoting *State v. Copeland,* 928 S.W.2d 828, 847 (Mo. banc 1996)). Instructions made in the disjunctive are often used in cases of accomplice liability because as MAI–CR 3d 304.04 Notes on Use 4, has noted "[t]here are almost an infinite number of variations in factual situations of accessorial liability." "[T]he purpose of the disjunctive instruction is to give the jury an opportunity to consider evidence that is unclear," such as when it is unclear whether the defendant acted alone or with an accomplice, or if it is unclear as to which person committed which acts. *State v. Shockley,* 98 S.W.3d 885, 891–92 (Mo.App. S.D.2003). Instructions must be supported by substantial evidence and reasonable inferences to be drawn therefrom. *State v. Howard,* 896 S.W.2d 471, 492 (Mo.App. S.D.1995). Clearly, disjunctive submissions of alternative means by which a single crime can be committed is proper only if the alternative submissions are each supported by the evidence. *Puig,* 37 S.W.3d at 377.

Our review of Appellant's claim of insufficient evidence is limited to determine whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt. *State v. Chavez*, 128 S.W.3d 569, 573 (Mo.App. W.D.2004). We do not reweigh the evidence, but determine if the conviction is supported by sufficient evidence. *State v. Mann*, 129 S.W.3d 462, 467 (Mo.App. S.D.2004). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict and disregard all evidence and inferences to the contrary. *Chavez*, 128 S.W.3d at 573.

■ We find sufficient evidence was introduced to allow the jury to determine that Appellant acted together with Winks and was sufficient to support an instruction that Appellant "acted with" Winks in the commission of this crime. The evidence showed that Appellant agreed to provide drugs to the informant. He reiterated that he was on his way to provide the drugs each time the informant talked to him. Later, Appellant told the informant to call Winks for the drugs and when Winks did not appear with the drugs at the hotel, Appellant told the informant that "we [Winks and Appellant] would be right there." Appellant was with Winks as he went to purchase the drugs but, because he could not meet with Winks' dealer, Appellant waited at a gas station. Appellant went with Winks from the gas station to the hotel to meet the informant.

*Puig* is easily distinguishable from these facts. In *Puig*, the confidential informant went to the home of a known drug dealer. *Puig*, 37 S.W.3d at 374. The defendant, who did not live at the home but was already there when the confidential informant arrived, stated that he did not have any drugs for sale. *Id.* The confidential informant then bought drugs from the owner of the home. *Id.* at 374–75. During the sale, the person making the sale asked the defendant to go to his truck to get his scale so that he could properly measure the marijuana. *Id.* at 374. This Court in *Puig* held that these acts were not sufficient to amount to a conduct element and so Appellant could not have been acting together with the person making the sale. *Id.* at 377. *Puig* strictly construed the requirement in MAI–CR 3d 304.04 Notes on Use that if the instruction is presented in the disjunctive, separate evidence of each must be presented and, more specifically, that "acted with" necessitates evidence that the defendant committed a "conduct element" of the crime. *Id.*

We, however, find *Biggs* to be instructive. In *Biggs*, the court found that it was not plain error to instruct in the disjunctive where there was a substantial amount of evidence that defendant was aiding and abetting and the evidence showed defendant participated in the crime. *Biggs*, 170 S.W.3d at 505. *Biggs* suggested that "applying [the *Puig* ] rule to an instruction on accomplice liability is uniquely problematic." *Id.* at 504. *Biggs* also noted that "[w]hile circumstances may occur in which alternative theories of accomplice liability could require a different quantum of evidence to support them (such as theories evincing different states of mind), usual theories of aiding and abetting do not include such issues." *Id.* at 505.

In *Biggs*, the defendant provided the weapon for his son to use during the robbery, drove with his son to the store, waited in the car while the son committed the crime, and then drove the get-away car. *Id.* The court noted, "Mr. Biggs associated himself with the venture for which he was charged and that he participated in the

crime by providing essential conduct for its successful completion." *Id.*

The distinction between *Puig* and *Biggs* is that in *Puig* the defendant did not provide essential conduct to complete the "acted with" portion of the instruction. Moreover, the defendant in *Puig* did not bring himself to the crime as did the defendant in *Biggs*. *Puig* operates under a strict requirement that a defendant commit a "conduct element" of the crime, and *Biggs,* which is a later case, expands that strict construction to take into consideration factual situations where the elements of the crime are clearly conducted by a person other than the defendant, but the defendant's acts indicate that he intends to be present during each stage of the crime with the purpose that the crime be done. This reasoning properly aligns with the "central tenet of accomplice liability [which] is the notion that all who act together 'with a common intent and purpose' in committing a crime are equally guilty." *Biggs,* 170 S.W.3d. at 504 (quoting *State v. Copeland,* 928 S.W.2d 828, 847 (Mo. banc 1996)).

The evidence did not support Appellant's claim that he did not participate in the conduct element of the crime, the transfer of the controlled substance. Appellant actively participated in the process that caused the crime to occur. The trial court did not commit error, plain or otherwise, in instructing in the disjunctive on accomplice liability. Point two is denied. The judgment is affirmed.

LYNCH, C.J., and BARNEY, P.J., concur.